Great. We will hear argument then in our final case, number 21-1311, Uncork and Create. And Mr. Martin, it sounds like you're first. Good afternoon, Your Honors. May it please the Court, James Martin for Appellate Uncork. The coverage issues in this case, obviously, are part of a nationwide controversy on the construction of all-risk business interruption insurance policies. But this Court's task is not to resolve that controversy or to settle a debate over which line of case authority has the right analysis. Instead, the analysis that this Court must undertake is how West Virginia, applying its policy construction principles, would construe the policy language in dispute. And if this Court ultimately concludes that the coverage issues raised are so significant and important as a matter of public policy, that it would benefit from guidance from the West Virginia Supreme Court, it can certainly certify the issues there. But either way, what has to be settled is West Virginia law and only West Virginia law. Now, in a West Virginia policy construction dispute, my client, Uncork, and the insurer, Cincinnati, have very different burdens where the policy language is concerned. For Cincinnati to prevail, it has to establish that the relevant language in the policy clearly and unmistakably supports the construction it offers, but equally importantly, it also must establish that the language supporting the construction is unambiguous and it's the only reasonable construction possible. For Uncork, the burden is not nearly so steep. My client simply has to offer a reasonable construction among the many constructions that might be possible. It doesn't have to be the only one, and it doesn't have to be the best one. And accepting Uncork's construction does not mean that Cincinnati's construction must be deemed implausible or even that it must be rejected. It only needs to show, that is Uncork, that the events and conditions that result in the claim for coverage fit within the ordinary definition of the policy terms. And as our briefing makes clear, given the language used, which is not a model of clarity, and West Virginia case law, which favors a construction in a coverage case for the insured, and with the Murray and Chapin cases, we submit there is ambiguity in this policy. And in the face of that ambiguity, an ordinary insured could read the policy to extend to a complete loss of use of the property for its intended business purpose for the reasons Uncork has explained. By the same token, this policy language... Can I ask you about that loss of use? Yes. What if, and I understand this is not the case, but what if your client operated a pharmacy or a hardware store, something that the governor considered essential, unlike a paint and sip, which he did not consider essential. The governor, if it was a hardware store or a pharmacy, could your client still have operated in the office space? Here, the answer to that is no, Your Honor, and it's unequivocal. So as a result of the presence of the virus and the spread of the virus, the transmission of the virus, and finally the closure orders, there was no option for Uncork to operate. I know Uncork couldn't operate a paint and sip business, but what if instead Uncork was a hardware store? Excuse me. Sorry about that. If the property remained open and could be used for its intended purposes, we wouldn't be talking about business interruption coverage or the suspension of use of the property for the purpose, so it could work for that. So I'm wondering, because of that, if that indicates that it's the kind of service that your client provides that was prohibited that kept them from operating. It's not the physical space. There was nothing about the physical space that prevented them from operating. It was the type of service they provided there that they could no longer provide there. So two things on that, Your Honor. The type of service does matter for purposes of this insurance. After all, Cincinnati wrote a policy for my client, and we paid an extra premium for the business as a going concern, the way that it operated, for its intended purpose. So intended purpose does very much matter here in terms of coverage. I'm wondering about how that goes to the meaning of physical. Okay. So for physical, we are looking at the ordinary definition of the term, which means something tangible, and here we're talking about the brick and mortar space and the loss of use of the brick and mortar space. This is very much a physical limitation. We can't hold events in our space. But you could. You could open a hardware store or a pharmacy, or you could use it as an office, right? Someone who owned Uncork, if they just wanted to make it their personal office just for one person to sit in all day and, you know, make phone calls and write letters, they could have done that. They just couldn't operate the kind of business that they wanted to operate there. As I said, Your Honor, that would betray the purposes for which the coverage was purchased. Is that right, counsel? Because I don't, I mean, the provision doesn't seem to contemplate sort of regulatory restrictions on use. I mean, what if it were a hardware store, but there was some executive order that said you can stay open, but only two customers at a time, so you wouldn't be able to use it according to its intended use, which was to have more than two customers at a time, and there would be a loss of business income. Would you think that would be property damage? So, Your Honor, what we are talking about here is the interruption of the business, not property damage directly. Okay, so in my hypothetical, your business would be interrupted and it would be covered. In your hypothetical, the business is not completely shut down, which Uncork's business was. As to the alternative use, that isn't what was insured. Nobody said we'll pay Uncork and Uncork should pay a premium for a coverage where it's not event space. That's how the premium was set. That's what the policy was about. On the physical side of it, the property was physically lost to Uncork for its intended purpose. And under the Murray case, I'm sorry. Mr. Martin, what if the governor had just said you can't use this as an event space three days a week? Okay. Right. Would there be a physical loss then? So that would not be a complete physical limitation on the use of the property,  But then doesn't that get you just back, if you need a complete physical limitation on use of the property, why isn't that just back to Judge Rushing's question? You're allowed to use the property. You can go there every day. You can, like, do whatever your inside office work is. It's fine. Use the property. There's nothing wrong with the property. Well, as I said, Your Honor, that would betray the purpose for which the coverage was purchased. The business interruption portion of this policy, the business income portion of this policy, it's not an insurance policy against business interruption. It's an insurance policy, as I understand it, against physical damage and loss. And then there's this extra provision where, in addition to actually replacing or repairing the physical damage, you will also get coverage for a suspension of business that results from that physical loss. So not only will they buy you a new furnace, but they will pay you for the two days you had to shut down because you didn't have a furnace. But it's not general business interruption insurance. No, but, Your Honor, when it comes from a non-structural event or set of conditions that make the property unusable, Murray tells us that is a definition of physical loss under West Virginia law. But what about the fact the policy refers to other terms like period of restoration, loss to the property as a premises? What is the period of restoration under your viewpoint? So two things there, Your Honor. Again, from the perspective of the ordinary insured who purchased a business interruption policy that starts with the physical loss, as Murray contemplates it, and is unusable, we have the triggers for coverage. On the perceived tension between restoration of the property and the provisions for loss of income where the property can't be used, ambiguity abounds in those provisions as well. And it is not necessary to read them to defeat coverage in this instance. And remember, West Virginia law will not do that unless it clearly and unmistakably is required by the policy language, not by rewriting it, not by redrafting it, but by what it says. Now, for the repair and rebuild language, Your Honor, that only applies in circumstances where a repair, rebuild, or replacement will be necessary. It doesn't affect the business loss of income coverage under the interruption portion. So to begin with, West Virginia would not make that part of a contextual construction. The second piece of the restoration language is that it's a timing issue. It's not a threshold coverage issue. It's a timing issue. So if there is a need to repair, rebuild, or replace, that provision sets a time limit on it. But it doesn't vitiate the coverage triggers in the first instance for business income. And finally, as we have pointed out in our brief, starting with ordinary definitions that a reasonable insurer would embrace, repair, rebuild, or replace can fit the restoration of the property for its intended use after its suspension. Those terms do not have to be read to involve physical repair. And let me go back to where I started. They can be. We are not disputing that. The issue is, do they have to be in the context of this policy? And the answer is, the policy doesn't clearly and unmistakably say that. And there is a construction, as we have offered, where an ordinary insured would say, my physical space has been lost to me by these closure orders. I cannot use it for the purpose that was insured under the policy. And that meets the definition of direct accident. I thought the policy covered lost income during the period of restoration. And I take your point, well, say you don't need repairs and all that. Maybe it doesn't apply. But what's the time period, under your theory, what's the time period during which the insurer must pay for the loss? It's very straightforward. It's the closure of the property and the unusability of the property. That's the triggering event on the front end, which came from the presence and transmission of COVID and the closure orders. And the period of suspension or restoration back to intended use comes about when the property is usable again. Here, that was about a two-month period, I think, for one of the properties. So was there a suspension of the intended use? Yes. Did it involve non-structural damage? It did. But Murray says that's not essential for physical loss. And at that point, I believe, Your Honors, there's at least six reasons a West Virginia court wouldn't narrow this policy down. The first one is... Before you get to them, I just want to make sure I understand. The rule you want us to adopt is that when a regulatory change makes property unusable for its intended purpose, there has been a physical loss. Right. There's a physical loss uncourt. Its operations cannot be used as it intended. Your answer is yes. Okay. So would that apply also to zoning changes? If the government had just said, through some zoning change, uncourt is now located in a purely residential block, so you cannot use it for its intended purpose. So our argument doesn't go that far. Why not? Because the physical limitations here exist on the use of the space as a result of these closure orders. That's the direct connection. I don't understand that. I'm proposing a zoning order that has the exact same effect, so tell me why they're different. The zoning change could conceivably meet the definition of the policy if not excluded, but we don't have to go that far. Tell me what your limiting principle is. The limiting principle is the same one adopted in Murray. Where the physical limitations that are imposed by the event or condition make the property unusable for its intended purpose. In Murray, it was a residence. Here, it is as events. And in my hypothetical, it's a zoning order. I'm not seeing the limiting principle. Well, if the zoning order is not going to permit us to use it for its intended purpose, there could be the potential for coverage in that instance. But we don't have to go that far. I think you do. I mean, I think we've just established that you do. But that's fine. So your position is any regulatory restriction on intended use. It could be a zoning order. It could be a curfew order. It could be a capacity order. Your Honor, I don't want to go that far, as I said. I know you don't. This ordinance, this issue in this case, is aimed at the physical space directly. It's closed, and it can't be used, period, for its intended purpose, right? And so it's the direction of the events and conditions at the physical space itself that is the distinguishing feature here, and it is the limiting principle, just as it was in Murray. Yeah, let's get back to the policy term. What about direct physical loss? OK. Right. Because that's our starting point. No, no. You've led us really, really far afield, I think. Well, I don't think so, Your Honor. No, I'm not saying you're distracting us. But I'm saying we've really got to focus on the ambiguity of the policy term itself. So perhaps you could wind up by telling us. Let me go right there. What is ambiguous, based on your theory of the case? Under the policy, the coverage-triggering event requires direct accidental physical damage or accidental physical loss to the insured premises. Now, there are no policy definitions for any of that, not for direct, not for accidental physical damage, or in the alternative, accidental physical loss. So what would a West Virginia court do? It would look to the ordinary meanings of those terms. So as far as direct is concerned, we have a direct line from the existence of the virus to its transmission and spread to the closure orders, which closes our business. So direct is met. And in fact, there's no contrary argument being made. Loss, in ordinary parlance, is defined as deprivation or the inability to utilize. And here, Uncork plainly was deprived of that. It couldn't use its business for its intended purpose. Right. But physical is an adjective. Right. So the physical piece, Your Honor, relates to the brick-and-mortar premises where Uncork operates. The shutdown of Uncork's business was a physical limitation on the use of its space. The face was physically lost to Uncork. Its operations were physically suspended. And the property had no functionality for its intended use. So we're back to the relevance of intended use. And under West Virginia law, we know that's important because Murray tells us it is. Murray's not about a regulatory restriction, a temporary regulatory restriction. It's about an imminent physical threat. Those seem really different. I'm having trouble reading Murray to address the effect of regulatory restrictions. Because it would be, and I think you've not quite conceded this, but our colloquy has fleshed out, that you don't want to have to really say every regulatory restriction is suddenly covered by property damage insurance. No, but I don't have to. The burden that I have to assume, I believe, Your Honor, is to bring the policy language and its ambiguity to bear so that my fact pattern can be covered. Can I ask a question about the policy language? I'm looking at the business income, you know, extra thing. And it says that what you need is there has to be a suspension of operations that was caused by the physical loss. And so you want to use the same suspension of operations for both of those things, right? It's just there's one suspension of operations, that's the first suspension of operations, and it was caused by a suspension of operations. It was caused by events or conditions that meet the definition of physical loss. Right, but the other way of putting that would be you have sustained a suspension of operations as a result of a suspension of your operations by the order. Doesn't that seem sort of strangely circular to you? Your Honor, this entire policy is strangely circular. Try reading it all together with the definitions plugged in, and you will find that it is circular as to suspension. But that's not my issue, that's the drafter's issue. I guess what I'm getting at is it seems like the policy contemplates two different things, a suspension and a physical loss. And if it contemplates two different things, I'm having trouble seeing how the same thing, a suspension order, can satisfy both prongs. Okay, so it is more than the closure orders, Your Honor. It's the events or conditions that lead to the closure orders. It involves, first of all, the existence of the disease, the threat of the spread, the transmission, and that results in the closure orders. So we have, on the continuum, a direct series of events that provide for coverage. Back to Murray for a minute, Your Honor. There are lots of ways to read Murray, but the important thing are the two things that the court actually said, that physical loss may exist in the absence of structural damage to the insured property. Okay, but at that point there was no access to the property. I mean, there was expert testimony. Wasn't there that boulders were going to come crashing down? So that was the second piece of it, that the property was rendered unusable. And remember, in Murray, that was for a residence. The court didn't say, well, it's usable for storage or anything else. The issue was, as a residence, the same analysis that we are presenting here. So now we're back to what would a West Virginia court do? Would it adopt a limiting construction of this policy language to defeat coverage for the insured? Well, I think it wouldn't, and here's why. First of all, Murray starts us down the path of saying that there could be coverage, and so there's no reason to think that another principle of West Virginia law would emerge. Second, back to Your Honor's point on zoning and the rest of it, nothing in the policy expressly excludes the causal chain of event that renders this premises unusable. There's no clear and unmistakable language that says that. Without that specificity, West Virginia is not going to adopt a narrow construction. It's not even going to look for one, and it's going to read it in light of dictionary definitions and what they compel, and as I said, we can fit within dictionary definitions here. And finally, West Virginia's courts won't redraft the policy, and they will credit the conflict in the cases, which have gone both ways. That's the Chatham case. So that gets us to the point, Your Honors, of ambiguity and the potential for coverage. Thank you very much. Good afternoon. If the court please. My name is Daniel Litchfield. I represent the defendant, Appalese, Cincinnati Insurance Company, et al. I think we have a pretty stark contrast here between two different ways of looking at the same language, but it's important to start with the understanding that this is, after all, a commercial property policy. As has already been observed, we're talking about the need for a suspension of operations, and the policy quite clearly says that suspension has to be caused by accidental direct physical loss or accidental direct physical damage. Then it goes on to say that the business income coverage, not business interruption coverage, which implies something quite different, that the business income coverage is payable for the period of restoration, which the policy says is the period of time it takes to repair, rebuild, or replace the property or to establish the business at a different location. So the contrast is that Cincinnati sees this as an important opportunity to read this policy in context, and there are two levels of context that are critical. First, the context that this is a property insurance policy. So the term accidental direct physical loss or accidental direct physical damage has to be read in the context of the overarching fact that this is a commercial property policy. And then those words themselves need to be read within context, those words amongst each other in context. UNCORC presents a number of techniques to try to eliminate context and particularly to eliminate any use of the word physical in the phrase direct physical loss or damage. But the order at issue, which is alleged to be the cause of their issues, permitted the use and occupancy of the premises, just no customers on site, clearly directed to the idea of keeping people apart, social distancing, particularly very early in the pandemic. This is an order back in the spring of 2020. After the order lapsed, new orders came out, and ultimately everything went back to where it was. At the very least, there were suggestions that people clean and disinfect and that there be social distancing or use of masks. But other than that, right back to where they started. That works contrary to the idea that there was some cataclysmic physical problem with the space. Rather, it was a different kind of problem again. So net of this order in West Virginia, no buildings got rebuilt because of it, no tables or chairs were replaced, no walls were torn out. It's very different from the situation, for instance, with asbestos, where walls get torn out because the asbestos is on purpose as part of the construction of the structure. That's the problem in these asbestos cases. This is something yet again. The trial court and Cincinnati are proponents of established West Virginia insurance law principles. These are stated in Murray and were followed by the court below. Murray was factually distinguishable, according to the court below, and I'm here to explain the reasons why it is factually distinguishable. Also important to note that during the course of this order, even though there were restrictions on the use of these particular premises, people were still other places. They weren't put out into the woods in tents. They were in structures. They were in buildings. That works against the idea that this can be transmuted into some sort of physical property problem rather than what it truly was. So what are those basic West Virginia principles? We're challenged to make this about West Virginia, and that's important to do. Among them, we've noted the plain and ordinary meaning rule, and that's based on the Saliva case, which is followed in Murray and which was expressly followed by the trial court below. One should not define terms out of context. Context is important, and that's the Glen Falls insurance case, Glen Falls v. Smith. To have an ambiguity, it's been conceded that the alternative meaning must be a reasonable meaning, not just any meaning that one could come up with. The court is supposed to read the policy to avoid ambiguities and not work the language to try to create them. And last, a court cannot create a new contract using these... I guess how those principles apply here, because we do know from Murray that a physical loss doesn't require a change or alteration in a building's structure. So it seems clear that under West Virginia law at least some forms of kind of physical dispossession may amount to a physical loss. So what do you think is sort of the limiting principle in West Virginia law on that kind of physical loss by dispossession? What's required for that that we don't have here? I think it's stated in Murray, which there has to be permanent disposition. The distinction between this case and Murray is that in Murray those 3 homes set at the foot of this tall wall which was engineered and which boulders were falling off of, they'd hit 2 of the 3 homes. One of the issues in the case was the extent of the insurance payment that should be made for the 2 that were hit. Should it be for the holes in the roof and damage to the siding, or should that be considered to be a total loss? And what the court held was it was uninhabitable. As a matter of fact, for the family that had the house that had not been hit, the fire department came and told them you're out of here. You can't live here. And they never lived there again because that home was uninhabitable. Now, Murray deals with a number of issues and it's fascinating to read. I just want to make sure I understand what you're proposing. You said 2 things, that in Murray it was permanent and that the premises were entirely uninhabitable. Are those 2 different conditions you would put on that dispossession form of physical loss? Yes, and I would concede that they could exist in tandem in many instances, but I could conceive of instances where you have one without the other. But the key is the permanence and the key is the disposition. And I think that's how Murray is seen by other courts. For instance, in the Santos decision from the 6th Circuit Court of Appeals, a very recent decision, it extensively discussed Murray and a number of other cases in what I would call the Murray genre that were cited to that court. And what Santos tells us is that Murray and those other cases, all of which I think are relied on by Uncork here, do not establish that you have the direct physical loss or damage that's required for this coverage. I think what the court said in Santos, and this may be close to a direct quote, is in those cases they can't use the property ever again for anything. And that's a distinction with a very big difference from the facts of this case. The complaint here merely alleges that the virus is everywhere, it's ubiquitous, and there's this order. And the order did not allow us to use our property as fully as we wished to use it at the time when we wished to use it. And I think that's very different from Murray. Also, the physicality is not here as it was in Murray. In Murray, you had the wall there. You had the boulders coming off the wall. You had the reports of the engineers about that whole dynamic. And you had the engineers saying, with their stamp on their report, that these boulders will inevitably continue to hit these houses. People can't live there. And they didn't anymore, and they never returned. So I think that's an important limiting principle, and one that is consistent with the decision by the court below. That is that Murray would not allow this complaint to get any further than a Rule 12b-6 motion. Murray started by looking at single words, the word landslide and the word erosion. And in interpreting those words and what they meant, what did it do? It didn't jump to the idea that, well, there's some sort of conflict in the cases, so as a result, we go right to ambiguity and the policyholder has coverage. No, not at all. What they did is they looked to 8th Circuit cases and Ohio cases and a treatise to determine what the word landslide meant. And they looked to cases from out of state to determine what the word erosion meant. They then moved to concurrent causation by negligence because one of the things that was going on in Murray was that there were allegations that that wall behind these houses had been negligently designed and negligently built and negligently maintained. And they had to sort out how those concurrent causes could have an impact on the coverage issues before the court. What did the court do to sort that out? It looked to a Minnesota case, which it described as the seminal case in the area. It didn't jump right to ambiguity because there's a difference in the jurisprudence, so we're done here. Wipe its hands and move on to the next case. No, they looked at the Minnesota case, the seminal case. There was the anti-concurrent causation language, which was also an issue in Murray. What did the court do about that? It looked to a state appellate court case from Georgia. It attached an appendix of 38 out-of-state cases addressing that issue in the process of sorting out what the law of West Virginia should be. It did not jump to some big disagreement amongst cases nationally and say, well, we're done here. Policyholder wins. It did what courts always do in these cases. It looked to the jurisprudence that was available. It sorted it out, and when it found cases from outside West Virginia to be persuasive, it said, Murray said, those cases are persuasive, and they applied them. So you get to the direct physical loss issue, which I mentioned a moment ago. You had these rocks hitting these houses and inevitably going to hit them again, and the court held that it was this permanency, this inability to inhabit these homes that caused this to meet the requirements for those policies, and again, nothing like that is alleged here. Here, businesses were all allowed, even if they weren't essential, to access and be in their property. They could be there to take care of the books. They could be there to handle phone calls. They could be there to plan for the future. They could be there to plan for the imminent end of these restrictive orders. They just couldn't entertain customers in the space during that limited period of time. Not so for the homeowners in Murray. Fire department said, you have to leave, and you're gone forever. Very different circumstance. There are similar interpretive rules that have been applied by other United States courts of appeals. There's the Gilreath case from the 11th Circuit, the Mud Pie case from the 9th Circuit. Both of them involved so-called stay-at-home orders. They both involved application of the plain and ordinary meeting rule. They both found that there was no permanent dispossession of those spaces and found that there was lacking any allegation of direct physical loss or direct physical damage that would allow the cases to go forward. Mud Pie is interesting also because it addressed a California appellate case called Hughes. Hughes is a marquee case in the briefs for uncourt. That's right up there with Murray. Mud Pie tells us, and we know this to be the case from reading Hughes, that Hughes is not at all about whether there's direct physical loss or damage. Indeed, in Hughes it's demonstrable that there clearly was direct physical loss or damage. A large part of the property slid into the ocean. The issue was that they stabilized the dwelling, and then they were looking at whether the land underneath the dwelling should be considered a part of the dwelling. That was the legal issue in Hughes. Hughes doesn't speak to direct physical loss or damage, and it's inappropriate to see it as such. So, quick note about Santos. Santos, as I said a moment ago, addresses Murray, and importantly in that context also addresses cases like Port Authority or Seaford or the First Presbyterian Church case, among many others that are cited and relied on by uncourt here, and disposed of those cases on the basis that I described earlier. As I mentioned, I think the main divide in this case is between Cincinnati's assertion that things ought to be seen in context and that context matters, and that's one of the first principles of insurance coverage law in West Virginia, and efforts by uncourt to get out from under context. One of those efforts has to do with looking at dictionary definitions. The good example of why that approach should not be followed. We are told by uncourt that, well, in the definition of period of restoration, it says repair, rebuild, or replace, and repair has a bunch of dictionary definitions, and one of them suggests that repair is in the context of repairing a relationship. So, a parent and a child repairing their relationship, or two old friends repairing their relationship. That's where context, including overall context, matters. This is a commercial property policy. It isn't about interpersonal relationships. The fact that there is a definition of repair that addresses the context of interpersonal relationships simply doesn't speak to what we're about here. So, look at the definitions of repair and the common sense meaning of repair in the context of an insurance, property insurance claim. The ordinary fact situation would be a fire or a storm. So, the place is destroyed by the fire or the storm. That's property coverage. What do they get? They get a new place, or repairs to the place that they've got. They also get this added extra coverage, which is the business income coverage, which is tethered to direct physical loss or damage, just like the damage from the storm or the fire is tethered to direct physical loss or damage. Help me understand. How would something like this apply? What if there were an executive order that said places like Uncorked could stay open, but first they have to fix their ventilation systems, and so they have to knock out their ceiling and put in big fans, and now I'm out of my area of expertise, but you get the drift. There's going to be some major structural repairs required. Would that be covered? No, and here's the reason. For one thing, even to the degree one might see that as direct physical loss or damage, there are exclusions in the policy that we don't need to reach here and that we have not reached. Putting to one side the exclusions, would it otherwise fall within the definition in your view? No, because that's a government order regulating or restricting their operations, just like an order, for instance, from the fire department that says your maximum occupancy now is 100, not 120, or something in terms of sign regulations. No, your sign can no longer be 20 feet high. We need it to be down at 5 feet high. All those sorts of things cost money to address, but they are not examples of direct physical loss or damage to property. And importantly, they're not examples of a situation where the suspension of operations is caused by direct physical loss or damage to property. Actually, the hypothetical posits that you have a suspension of operations and then you get into the issue of doing something with the property to comply with the government order. Well, they wouldn't be accidental either, right? The government orders you to, you know, building codes have changed and so now you have to install more fire exits or something. That's not an accidental physical loss or an accidental physical damage. It is not. That's talking about a different part of the definition, but it's on purpose, but it's required by the government. Yeah, very much so. And one last thing, since we're dealing with a hypothetical, it is conceivable in such a case that the property owner, other than undertaking the work that's being ordered by the governmental entity. Sure, there are situations that I've at least seen in my personal experience. My brother runs restaurants where they decide that things that they're ordered to do aren't worth it, so they change the business model or they go to a different jurisdiction. I'm not sure how much your colleague is really pressing this argument, but there is this argument and at least it's been adopted by some district courts that fine, fine, the suspension order is not a physical loss or damage, but the presence of the virus on the property is itself a form of physical damage and then they cite cases about smoke and noxious gases and other airborne particles that have in some circumstances been deemed to constitute physical damage or physical loss. So is your position that that kind of airborne contaminant, because it doesn't sort of attach to physical property, can never be a physical loss or physical damage or is it that there's something different about COVID? How do you respond to that line of cases? Well, yes and yes and there's more. First of all, when you look at those kinds of cases in the jurisprudence, asbestos I've already talked about, an odor case like Tritonich in Oregon that was a house and cooking meth created permanent odors that could not be removed from the structure. You look at the First Presbyterian Church case from the Colorado Supreme Court, those were fumes from petroleum, but those fumes permeated the structure and could not be removed, at least not without steps or efforts that they were apparently unwilling to make, but the fact of the matter is that they permeated the structure in the first instance. Same with smoke. If anybody's ever been over to somebody's place where they've had a bad kitchen fire, one of the issues the homeowner might comment on is, the place still smells like smoke, I can smell it. And that's an example of a situation where it can be permanently affecting and changing the physical property. That's not COVID. How do we know that's not COVID? Well, first and foremost, and the court, I believe, can take judicial notice of this. We argued inside of the support for this in the trial court that the trial court could take judicial notice of the CDC's findings and directions. And what the Centers for Disease Control tell us is, this can always be wiped up with a disinfectant or even soap and water. How is that different from other maintenance? My very first job in life, real job other than cutting grass, was to be a dishwasher in a steakhouse. And every night I had to mop the floor. Never for a minute occurred to me that I was repairing damage to the floor. It was maintenance. I was cleaning it. That's the COVID story. Very different from those other sorts of cases in terms of what I think this court can take judicial notice about, which is it can always be cleaned with soap or disinfectant. And that takes us into the Mamajos case from the 11th Circuit Court of Appeals, which dealt with dust and debris from road construction. And they wanted to be paid for cleaning that up periodically while the road construction was going on. And the 11th Circuit held in that case, applying Florida law, that no, that's maintenance. That's not direct physical loss or damage to property. It's something quite different again. And that case has been followed subsequently in the 11th Circuit as well as by federal district courts in that circuit. I note that my time is up, but if there's more that I can answer, happy to do that. All I would ask then is that the trial court's decision be affirmed and that we not accept an invitation to look at this situation as an opportunity to apply some of these plain and unambiguous terms into something that they are not. Thank you. Thanks. But Martin, I think you have some rebuttal time. Yeah. Great. Okay. Thank you, Your Honors. In this effort to look at out-of-state authority, obviously that's a two-edged sword here because of the conflict in those decisions. But importantly, in looking at that out-of-state authority, you'll find in cases like Mud Pie or Santos, there is an underlying state court decision that gives rise to the court's coverage analysis, something that is here in Murray and here in Chafin, both cases which lead in a very different direction. As far as disdaining dictionary definitions or calling this alchemy, when terms are what West Virginia courts do. As far as repair is concerned, for example, that can mean restore to use. That is the essence of what we are advocating here because our property, as a result of the virus and the closure orders, was unusable. As to accidental, Your Honor, that can be looked at in this policy as coming from the perspective of the insured. And certainly there was nothing accidental about these closure orders from its perspective. So there is no compulsion to read the policy in the way that the insurers suggest. Quite the contrary, we should be looking for ways to read this in favor of coverage. Now that brings us back to Murray as the underlying case. All the facts of Murray were dumped in as though those were limiting principles that the Supreme Court of West Virginia applied in deciding the case. It didn't. Murray, we know, looked at the effect on the property. That's what Uncork urges here. The residence was unusable. That's what Uncork says here. The West Virginia Court, when it said it directly, said that physical loss may exist in the absence of structural damage to the insured property, exactly what Uncork urges here, and does not include losses rendering the insured property unusable, exactly what Uncork urges here as a result of the closure orders. Now, Murray did talk about the property being damaged, but the court did not put that in terms of a limitation on coverage. And at the very minimum, Murray can be read to support the construction that we offered. So then the question is, would a West Virginia court narrow this down the way that they have suggested? And as I said, there isn't a reason to think that it would. There is nothing in this policy that requires physical or structural authorization written clearly and unmistakably. Hey, Mr. Martin, what about the fact that we're not just talking under the policy language of direct physical loss? We're talking about direct physical loss to property. That's correct. And not a loss to the business, and not a loss to the use of the premises, but a loss to the anything except more ambiguity to what it might mean in context when all the terms are read. But the loss to the property here is the physical inability to use it. That's what happened to Uncork. Seems to me, then, you're arguing that the loss to the policyholder equals the loss, in other words, the loss of access for business purposes equals a physical loss to the property. A policyholder could say, I have this water here. The virus enclosure orders take it away. That is physically lost to me for its intended purpose. I can't drink it. That is the construction that a West Virginia court would adopt. It would not go to revisions to this policy injected by the insurer to give it clarity that it doesn't have. It also would not follow the mode of analysis that the district court did, where the court disdained any real look at the definitions in ordinary parlance of these terms, jumped directly to the out-of-state cases to define tangible and structural as being required, which are not in the policy. Those are limitations injected in and went on to find that construction. In addition, and lastly, I might add that as to the period of restoration and all of that, the same analysis follows. Certainly, you can read this policy the way that Cincinnati suggests, but that does not mean that you read it to exclude the events or conditions that we have offered which fit within the policy's terms. Thank you. Thank you very much. We thank both of you. We are sorry we cannot come down and shake hands and thank you in person. We very much appreciate you being with us today and we hope we will see you again soon. With that, court is adjourned for the day and we will start again tomorrow. Thank you.
judges: Pamela A. Harris, Allison J. Rushing, Barbara Milano Keenan